IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAYNARD SNEAD,

    Plaintiff,

v.

CASEY CAMPBELL,
OFFICER PENDERGAST,
CO II WEAVER,
CO II BIBLE,
CO II THOMAS,

    Defendants.

Civil Action No.: RDB-19-2610

## MEMORANDUM OPINION

Defendant[1] Casey Campbell,[2] Warden for Roxbury Correctional Institution ("RCI"), filed a Motion to Dismiss or for Summary Judgment in response to the above-entitled civil rights action. ECF 12. Plaintiff Maynard Snead opposes the motion. ECF 14. No hearing is deemed necessary to determine the matters pending. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, the motion, construed as a Motion for Summary Judgment, shall be granted as to Warden Campbell and the complaint shall be dismissed without prejudice as to Defendants Bible and Thomas for failure to exhaust administrative remedies. Defendants Pendergast and Weaver shall be directed to respond to the Amended Complaint or to show cause why default judgment should not be entered against them.

---

[1] Although service of the Amended Complaint was accepted on behalf of Defendants Pendergast, Weaver and Thomas on December 13, 2019, no response to the Amended Complaint has been filed on their behalf. ECF 6 and 7. Service was refused on behalf of Officer Bible. *Id.*

[2] The motion is filed on behalf of Campbell and the Department of Public Safety and Correctional Services ("DPSCS"). ECF 12. However, the Amended Complaint (ECF 4) does not name DPSCS as a Defendant, therefore the Court does not address the Eleventh Amendment immunity argument raised in the Motion to Dismiss or for Summary Judgment.

## BACKGROUND

Snead alleges that Warden Campbell is "ultimately responsible for my health and well-being/safety while I am being held/housed within RCI." ECF 4 at 2. He adds that Campbell has a duty to ensure that "staff" comply with rules governing correctional facilities and "especially Rule #8 of the A[dministrative] R[emedy] P[rocedure] form rules." *Id.* at 4. He explains that the following acts by correctional officers at RCI represent a failure to properly supervise and train correctional staff who are supervised by Warden Campbell.

According to Snead, Officers Pendergast and Weaver shackled him incorrectly on an unspecified date for an unspecified purpose. ECF 4 at 4. Snead states that the manner in which Pendergast and Weaver shackled him ran afoul of the rules governing how inmates who rely upon the use of a cane are to be handcuffed and shackled during transport. *Id.* Snead claims he filed an administrative remedy procedure complaint ("ARP") regarding the incident stating that Pendergast should have been trained before being put in charge of transporting an inmate with a cane. *Id.* In the ARP response, Lt. Newlin remarked that Pendergast and Weaver have "now been trained in how to transport inmates with canes," but only after Snead was improperly shackled. *Id.* Snead claims he fell and sustained an injury as a result of the improper use of restraints. *Id.*

On November 20, 2018, Snead claims that Officer Bible intercepted "Nurse Gail" on her approach to his cell with his morning medications. ECF 4 at 5. Bible asked the nurse where she was going and upon responding that she was bringing Snead his medications because he was on bed rest, Bible replied "[h]e ain't getting shit . . . because he likes writing officers up!" *Id.* Bible then told the nurse to throw the medications away. *Id.* Snead explains he heard the exchange clearly because his cell door was open. The following day, after the nurse left the housing unit

2

without dispensing medication to Snead, he called his sister to tell her he was denied medication two days in a row and was in severe pain. *Id.*

On November 21, 2018, Snead returned to the housing unit following an attorney visit and encountered Officer Bible in the main hallway. ECF 4 at 5. Bible asked Snead if he had told his lawyer about him. *Id.* Snead ignored the question, but Bible persisted saying that he didn't care if Snead had reported him to his lawyer. *Id.* He added that he knew Snead was faking his injury from the fall and that if he didn't stop using the wheelchair soon he would have Snead transferred to Cumberland where "they don't give a [expletive] about you being blind or writing an ARP." *Id.* at 6. Snead adds that in January of 2019, when he was trying to obtain staff assistance with filing an ARP appeal, Bible told him that nobody was going to help him no matter how many times he asked. *Id.*

On November 29, 2018, when Snead returned to RCI following a surgical procedure, an Officer Thomas was working "in the part of medical called ASIA" and remarked that Snead was "still faking like you can't walk from that fall the other day." ECF 4 at 6. The transportation officers who were returning Snead to RCI replied that they did not know about Snead faking an injury but that it was certain he could not walk at that time due to the fact he just had surgery. *Id.* The transportation officer uncuffed Snead and left him in the care of Thomas who began asking Snead about his surgery. *Id.* When Snead did not answer her questions, Thomas threatened that if he kept writing ARPs he would end up on lock-up. *Id.* Thomas then placed Snead in an ASIA cell and said he was putting him there so he would know what it will be like to be on lock-up. *Id.* at 7. According to Snead, ASIA cells are used for disciplinary purposes and for suicide watch and have only a mattress in the cell. *Id.*

After waiting in the ASIA cell for approximately two hours, Snead states that Crystal Jamison, P.A., came to the area calling his name. ECF 4 at 7. Officer Thomas let Snead out of the ASIA cell and pushed his wheelchair to P.A. Jamison's office. *Id.* When Snead asked Jamison why she came back to ASIA to find him, Jamison replied that none of the nurses knew where Snead was, but knew he had returned from the hospital so she went looking for him. *Id.* Snead told Jamison he needed his pain medication and asked her to send him back to his housing unit so Thomas would not put him back into the ASIA cell. *Id.*

Warden Campbell asserts that Snead has not alleged Campbell was personally involved in the events giving rise to his complaint and that Snead has failed to properly exhaust administrative remedies, entitling Campbell to dismissal from this suit. ECF 12. As noted in his complaint, Snead filed an ARP on November 27, 2018, (ARP-RCI-0715-18) with Warden Campbell complaining that he had been improperly restrained for an x-ray trip. ECF 12-3 at 7-8.

In his November 20, 2018 ARP Snead explains that he had an x-ray scheduled for November 15, 2018, and when he arrived Pendergast told him he would be shackled for the trip and asked Snead if he wanted to "sign off" on the trip, which he had done on October 30, 2018. ECF 12-3 at 7-8. Snead explains that he is completely blind and suffers from Rheumatoid Arthritis which causes his left ankle weakness and pain in his knees and hips. *Id.* at 8. For these reasons, Snead walks with a cane. *Id.* Snead attempted to explain to Pendergast and Weaver that he had not been required to be retrained in three-point restraints previously and that if he was required to be restrained in that fashion he would not be able to walk. *Id.* Notwithstanding his explanation, Pendergast and Weaver restrained Snead for the x-ray trip, leaving Snead with nothing to support his legs while walking. *Id.* Although the officers held onto Snead's arm while escorting him down the ramp, he fell because his legs gave out on him. *Id.*

Warden Campbell responded to the ARP on December 28, 2018, and Snead received the response on January 2, 2019. ECF 12-3 at 7. Campbell's response states:

> Your request for administrative remedy has been investigated and is meritorious. In your ARP request you state that on 10/30/18 you were improperly restrained for an X-ray trip, which resulted in you falling and injuring yourself. Records indicate that staff did not follow proper restraint procedures but that they attempted to stop your fall, and when you fell you were immediately taken to medical to be examined. Staff has been counseled on the proper procedure for handling the transport of inmates with medical restrictions.

*Id.* Snead did not file an appeal of the Warden's response to the Commissioner of Correction until June 4, 2019, stating that he had asked for help in filing the appeal, but it was not given to him.[3] ECF 12-3 at 4. He states that the lateness of his appeal to the Commissioner should be excused given the refusal to provide him with assistance. *Id.* at 5. The Commissioner dismissed the appeal, noting that Snead had signed a receipt for the Warden's response on January 2, 2019, making his appeal untimely pursuant to COMAR 12.02.28.09.B. *Id.* at 6.

On July 12, 2019, Snead filed an appeal of the Commissioner's response to the Inmate Grievance Office ("IGO"), again noting that his requests for assistance in filing the appeal were denied. ECF 12-3 at 2-3. He also states that he has been "harassed, threatened, and placed in fear by officers trying to stop [him] from moving forward with this process on this issue." *Id.* at 3. Snead included in his IGO appeal a claim that he was on bed rest in November of 2018, and the officer made the nurse throw his medication in the trash on November 21, 2018. *Id.* The IGO appeal was dismissed on August 28, 2019 because Snead failed to properly exhaust his remedies through the ARP process. ECF 12-2 at 3, ¶ 3. Deputy Director Robin Woolford noted that Snead

---

[3] On March 14, 2019, Snead filed an action in the Circuit Court for Washington County seeking mandamus relief. ECF 12-5 (docket entries).

5

received the Warden's response on January 2, 2019, but had not filed an appeal to the Commissioner of Correction until June 11, 2019. *Id., see also* ECF 12-4 at 2-3.

In his Opposition Response, Snead maintains that his ARP appeal was not timely filed because his requests for assistance[4] in filing the appeal went unanswered and he was on bed rest until February of 2019. ECF 14. He claims that "DPSCS employees use scare tactics, fear, and . . . torture to prevent me from moving forward with the ARP process against a 'likable officer.'" *Id.* at 3. He adds that he does not believe he "needed to write an ARP" on the claims related to Officers Bible and Thomas, stating that "it all relates to November 15, 2018 when I fell and was injured during the medical trip." *Id.* Snead notes that the failure to provide him with assistance in filing an ARP and appealing it violates "ARP Rule #8" which states: "[i]f you need assistance in completing or submitting a Request for Administrative Remedy, write to your facility administrative remedy coordinator." *Id.* at 1-2. Snead states there is no recognized basis for refusing assistance and, to date, he has not been told why his requests for assistance went unanswered. *Id.* at 2.

## STANDARD OF REVIEW

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

---

[4] Snead explains that the only assistance he requires is for someone to "take dictation" because he is educated and literate. ECF 14 at 3.

6

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## ANALYSIS

### A. Personal Participation

As noted, Warden Campbell asserts the complaint against him is deficient because it fails to allege his personal participation in the alleged deprivation of rights. ECF 12. Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Liability of supervisory officials such as Warden Campbell "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed

7

to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

The crux of Snead's complaint against Campbell is that he acknowledged Officers Pendergast and Weaver improperly restrained Snead during a medical trip and that the officers were "counseled on the proper procedure." *See* ECF 12-3 at 7 (Warden's ARP response). Snead takes this response to mean that Officers Pendergast and Weaver were not trained in the proper procedure before they were assigned to take Snead on a medical trip. ECF 14. Even if that were the case, there is no evidence that Warden Campbell knew or should have known they had not been trained. Rather, the record evidence suggests that Warden Campbell became aware of the incident after it occurred and took steps to insure the improper procedures would not be repeated. Campbell's signature on the ARP is not enough to establish his personal participation. *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (allegation that warden "rubber stamped" grievances was not enough to establish personal participation) citing *Whitington v. Ortiz*, 307 Fed, Appx. 179, 193 (10th Cir.2009) (unpublished) ("denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations."). Campbell is entitled to dismissal of the claims against him.

8

## B. Exhaustion of Administrative Remedies

Defendant raises the affirmative defense that Snead has failed to properly exhaust his administrative remedies. If Snead's claim has not been properly presented through the administrative remedy procedure it must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e. The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d at 725, 729; *see Langford v. Couch*, 50 F.Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he. . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford* 548 U.S. at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original). But, the court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has an established "administrative remedy procedure" ("ARP") for use by Maryland State prisoners for "inmate complaint resolution." *See generally* Md. Code Ann. (2008 Repl. Vol.), Corr. Servs.

("C.S."), §§ 10-201 *et seq.*; Md. Code Regs. ("COMAR") 12.07.01B(1) (defining ARP). The grievance procedure applies to the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." C.S. § 10-206(a).

Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance" to include a "complaint of any individual in the custody of the [DOC] against any officials or employees of the [DOC] arising from the circumstances of custody or confinement." COMAR 12.07.01.01(B)(7). "A court may not consider an individual's grievance that is within the jurisdiction of the [Inmate Grievance] Office or the Office of Administrative Hearings unless the individual has exhausted the remedies" set forth in C.S. Title 10, Subtitle 2. C.S. § 10-210(a).

The ARP process consists of multiple steps. For the first step, a prisoner is required to file his initial ARP with his facility's "managing official" COMAR 12.02.28.02(D)(1), which is defined by COMAR 12.02.28.02(B)(14) as "the warden or other individual responsible for management of the correctional facility" and defined under C.S. § 1-101(k) "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." Moreover, the ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.02.28.09(B).

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP or fails to respond to the ARP within the established time frame. The prisoner has 30 days to file an appeal to the Commissioner of Corrections. COMAR 12.02.28.14(B)(5).

10

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO.[5] COMAR 12.02.28.18; C.S. § 10-206(a); COMAR 12.07.01.05(B). When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. COMAR 12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing." C.S. § 10-207(b)(1); *see also* COMAR 12.07.01.06(B). An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.S. § 10-208; COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute. *See* C.S. § 10-208; COMAR 12.07.01.07(D); *see also* Md. Code Ann., State Gov't § 10-206(a)(1)

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. C.S. § 10-209(b)(1)(ii); COMAR 12.07.01.10(A)(2). However, if the ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* COMAR 12.07.01.10(B); C.S. § 10-209(b)(2)(c).

The final agency determination is subject to judicial review in Maryland State court, so long as the claimant has exhausted his/her remedies. *See* C.S. § 10-210. An inmate need not, however, seek judicial review in State court in order to satisfy the PLRA's administrative

---

[5] If the Commissioner fails to respond, the grievant shall file their appeal within 30 days of the date the response was due. COMAR 12.07.01.05(B)(2).

exhaustion requirement. *See, e.g., Pozo*, 286 F.3d at 1024 ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

It is undisputed that Snead failed to comply with the procedural requirements for exhaustion of his administrative remedies both because he did not timely appeal the ARP and because he never raised the claims against Bible and Thomas in a separate ARP to the Warden. Snead maintains that his appeals were untimely through no fault of his own because he is blind and is unable to write an appeal without assistance, which he tried to obtain but could not. ECF 14 at 3. He adds that he was on bed rest until February of 2019, adding to the difficulty in complying with the filing deadlines. *Id.* He explains that he told Lt. Newlin that if he dismissed the ARP, he would need help filing an appeal. *Id.* at 2.

This Court finds that Snead's disability coupled with the fact that he was recovering from surgery, operated to make the administrative remedy procedure unavailable to him for purposes of appealing his ARP and the claim shall be deemed exhausted. Further, Snead's ARP was found to be meritorious by Warden Campbell, making the purpose of an appeal unclear. Snead's failure to initiate an ARP regarding the conduct of Officers Bible and Thomas was, by his own admission, not due to his disability or his medical condition. Rather, he simply mistakenly thought it was not necessary. His claims against Officers Bible and Thomas shall be dismissed without prejudice.

Currently there has been no response to Snead's claims against Pendergast and Weaver despite the fact that service was accepted on behalf of both Defendants almost one-year ago. ECF 5 & 7. These Defendants shall be directed to show cause why default judgment should not be entered against them.

## CONCLUSION

By separate Order which follows, the amended complaint is dismissed as to Defendant Warden Campbell and is dismissed without prejudice as to Defendants Bible and Thomas. Defendants Pendergast and Weaver are directed to show cause why default judgment should not be entered against them.

__OCTOBER 19 2020__
Date

_/s/ Richard D. Bennett_
RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE